# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

_____

JASON MARINO and JOY MARINO,     :
                 Plaintiffs,     :        No. 5:14-cv-4672
            v.            :
                           :
PILOT TRAVEL CENTERS, LLC, and     :
SOVEREIGN CONSULTING, INC.,     :
             Defendants.     :

_____

## MEMORANDUM
**Plaintiffs' Motion for Partial Summary Judgment, ECF No. 53 - Denied**
**Defendant Sovereign's Motion for Partial Summary Judgment, ECF No. 54 - Denied**
**Defendant Pilot's Motion for Partial Summary Judgment, ECF No. 55 – Denied**

**Joseph F. Leeson, Jr.**                                        **November 3, 2015**
**United States District Judge**

## I.     INTRODUCTION

On August 8, 2014, Plaintiffs filed a Complaint against Pilot Travel Centers, LLC

("Pilot") and Sovereign Consulting, Inc. ("Sovereign") for injuries arising from Plaintiff[1] Jason

Marino's alleged exposure to toxic liquids on or about March 21, 2014.  Compl., ECF No. 1.  On

August 31, 2015, all parties filed motions for partial summary judgment.  Pls.' Partial Mot.

Summ. J., ECF No. 53; Def. Sovereign Consulting, Inc.'s Partial Mot. Summ. J., ECF No. 54

(hereinafter "Sov's Mot. Summ. J."); Def. Pilot Travel Centers, LLC's Partial Mot. Summ. J.,

ECF No. 55 (hereinafter Pilot's Mot. Summ. J.").  For the reasons set forth herein, the Motions

are denied.

---

[1]     Where "Plaintiff" is used in the singular in this Memorandum, Plaintiff refers only to
Jason Marino.

## II.   BACKGROUND

### A.   Undisputed Facts[2]

Pilot owns and operates the travel center known as Flying J Travel Plaza 710 ("Facility"), which is located at 1623 Oliver Road, New Milford, Pennsylvania.  Sovereign is an environmental consulting and remediation firm based in New Jersey, with offices located throughout the country, providing assessment, engineering, construction management, and remediation services to clients throughout the United States.  Sovereign manages environmental programs for petroleum companies and performs environmental services at more than 800 service stations, terminals, and refineries in the United States.

Pilot's Facility has five underground storage tanks, which sit in a gravel pit, that provide diesel fuel or gasoline to Pilot's twenty-four dispensers (pumps).  Eleven of these dispensers are diesel fuel dispensers.   Three "observation wells" sit at the bottom corners of the pit and collect fuel leaking outside Pilot's tanks and dispensers (collectively referred to as Pilot's "tank systems").  The tank systems also have containment sumps as part of a secondary containment system intended to capture leaking fluid and prevent contamination of the surrounding soil.  Pilot claims that its Regional Maintenance Technician ("RMT") inspects Pilot's leak detection and secondary containment systems, including Pilot's observation wells and containment sumps, every month.

On or about October 17, 2013, Pilot's RMT was performing his monthly inspection and discovered that diesel sump number five had forty gallons of fuel in it.  Pilot's RMT cleaned it out, but when he checked the next day fuel was coming back.  The RMT could not find the

---

[2]     Unless a citation to the record is noted, the following facts are taken from Plaintiffs' Statement of Undisputed Facts, ECF No. 50, admitted by Pilot and Sovereign, ECF Nos. 66-67.

location of the leak.  Pilot's RMT did not note any fuel leak in either the September 2013 or November 2013 inspection.

On November 5, 2013, the Pennsylvania Department of Environmental Protection ("DEP") conducted an inspection of the Facility, identifying "two separate incidents: (1) previous spillage and soil impacted by gasoline associated with a release near dispenser #11" and (2) "presence of weathered petroleum within the tank field observation wells."  Pls.' Statement Undisputed Facts Ex. 7, ECF No. 50-4.  The DEP advised Pilot that these two releases violated the Storage Tank and Spill Prevention Act.  Id.  Pilot admits that its containment sumps should contain no water or product if its tank systems are functioning properly.  Pilot also admits that for weathered product to have accumulated in its observation wells, fuel first must have leaked from its storage tank systems and then leaked from the secondary containment system.  Pilot further admits that the weathered product discovered in its observation wells proves there were actual, reportable fuel releases from Pilot's tank systems and secondary containment system.

The DEP subsequently required Pilot to conduct hydrostatic testing on its diesel dispenser containment sumps.  Hydrostatic testing essentially involves filling each sump with water and "seeing whether it leaks."  The testing proved that the containment sumps beneath two of Pilot's diesel dispensers, numbers eighteen and twenty-one, leaked liquid.  It is therefore undisputed that liquid fuel leaked into Pilot's secondary containment sumps, which themselves leaked.  All told, the DEP's investigation revealed that Pilot's tank systems leaked fuel in nineteen separate locations, which Pilot admits was "excessive."  Sovereign denies any knowledge of the alleged leaks or Pilot's characterization of the same.

Plaintiffs and Pilot contend that Pilot hired Sovereign to investigate and remediate the numerous fuel releases at Pilot's Facility, following the DEP's inspection and issuance of

3

citations.  Plaintiff and Pilot contend that at all material times to this action, Sovereign performed environmental consulting, remediation, and management services at Pilot's Facility.  However, Sovereign denies these allegations, claiming that it was hired by Pilot to conduct site characterization activities at the Facility, including underground environmental testing and the installation of monitoring wells, at the Facility, which were required following the operational compliance inspection performed by the DEP in November 2013.

In early February 2014, Sovereign installed monitoring wells at the Facility as part of its site characterization activities and underground environmental testing.  During the installation of monitoring well number three ("MW-3"), Sovereign's subcontractor struck and ruptured an underground waterline providing water service to the diesel fuel dispenser islands, which had been shut off for the winter.  The damage went unnoticed until March 11, 2014, when Pilot activated the line causing water to come up through the soil.

Brian Becker, an environmental scientist and project manager for Sovereign, testified that as a "compromise" between Sovereign's program manager, Scott Beals, and Joseph Cupp at Pilot, Pilot would hire REMCO to repair the water line, and that if it was deemed Sovereign's fault for breaking the line, then Sovereign would cover the costs.  Becker Dep. Pls.' Statement Undisputed Facts Ex. 9, ECF No. 50-5.  Mr. Becker also testified that Sovereign does not hire third party contractors to inspect for leaks or test equipment.  Id.  Further, Mark Hedley, a facility maintenance analyst for Pilot, testified that he hired REMCO to perform the plumbing repairs in March 2014.  Hedley's Dep. Sov's Mot. Summ. J. Ex. M Part 1, ECF No. 54-15.

Brian Becker further testified that he knew there were separate phased liquids ("SPL") in MW-3 at the time he learned of the water line leak.  Becker Dep.  He stated that the water pipe was in the same general vicinity as MW-3.  Id.  Mr. Becker explained that it was possible to have

4

the SPL removed from MW-3 before the plumbers fixed the line, but that it would be costly and that the soil around MW-3 was safe.  Id.  Additionally, Mr. Becker testified that Pilot should have known how to investigate the source of the petroleum product, and that Sovereign was not involved with the condition of Pilot's sumps.  Id.  He stated that it was never determined where the product that leaked from the sixteen sumps originated.  Id.  However, Mr. Becker suggested that the SPL in MW-3 was attributable to the pathway of the utility vault.  Id.

On Friday, March 21, 2014, REMCO commenced excavation of the area of MW-3.  The REMCO plumbers assigned to the job on March 21, 2014, were Plaintiff, Frank Noone, and Timothy Parise.  Plaintiff testified that on that first day of the job, he assisted Mr. Noone, who was the "senior" plumber and his immediate supervisor.  Mr. Noone operated a mini excavator and dug in the area of MW-3.  Plaintiff worked in the excavation, probing the soil to ensure Mr. Noone did not strike anything of value (e.g., other underground piping).  Plaintiff testified that the plumbers encountered liquid after excavating to a depth of approximately three feet.  He stated that the excavation ultimately measured approximately nine feet by nine feet wide, and five and one-half feet deep.  Plaintiff and Mr. Noone observed a dark colored, muddy liquid. Plaintiff worked in the cavity of the excavation that Friday and his clothing was "wet" up to at least the height of his boots.  Nobody from Sovereign was on the jobsite that Friday.  A Pilot "manager" came over to observe the excavation, but he never advised the plumbers of the documented petroleum releases in the vicinity.

Plaintiff and Timothy Parise, but not Frank Noone, returned to the Facility on Monday, March 24, 2014.  Plaintiff testified that the pump worked only half the day, until it "burned up" from pumping so much liquid from the excavation.  Plaintiff testified that while working at the site the following Monday, he was in liquid up to his knees all day.  Pl.'s Dep., Pls.' Statement

Undisputed Facts Ex. 21, ECF No. 50-11.  At some time during his work on Monday, Plaintiff's supervisor at REMCO, Mr. Nace, advised Pilot that there was a mixture of fuel and water in the excavation.  Mr. Nace also emailed Pilot a photograph of the ruptured water line and dark-colored liquid that filled the excavation.  Mr. Nace testified that he advised Plaintiff to stop working until he was able to secure "about seven more thousand dollars from the customer." Nace Dep. Pls.' Statement Undisputed Facts Ex. 19, ECF No. 50-8.  Mr. Nace testified that the new proposal was dated Monday, March 24, 2014, so he would have advised Plaintiff that REMCO was approved to continue working on Tuesday.  Id.  In a work order completed by REMCO on March 31, 2014, REMCO states that the source of the oil that went into the excavation "is the oil water separator that is leaking into the ground."  Pilot's Resp. Opp'n Pls.' Mot. Ex. F, ECF No. 65-7.

Douglas Keith Carlton, an environmental project manager at Pilot, testified that he learned there was fuel in the excavation on Monday, March 24, 2014, after REMCO contacted Pilot.  Carlton Dep. Pls.' Statement Undisputed Facts Ex. 3, ECF No. 50-3.  Mr. Carlton further testified that he coordinated with Sovereign to address the problem and to work with REMCO to handle any environmental concerns.  Id.  He testified that in early 2014, although he did not know that exposure to diesel fuel could cause kidney damage, he knew of the "health concerns with the products."  Id.  Nevertheless, he admitted that he did not advise REMCO to stop work, but assumed they would stop working.  Id. But see Pls.' Statement Undisputed Facts Ex. 24, ECF No. 50-14 (Mr. Carlton sent an email to Brian Becker asking him to "assist" REMCO "with a vac truck to recover this free product while they work to repair the line.") (emphasis added).

Joseph Cupp, the senior environmental manager with Pilot, testified regarding the Facility's DEP violations.  Cupp Dep. Pls.' Statement Undisputed Facts Ex. 2, ECF No. 50-2.

He stated that he was aware of the risk of potential kidney damage from toluene in gasoline.  Id.
Mr. Cupp testified that he was also aware of the risk of kidney damage if petroleum is absorbed
in the skin.  Id.  When asked, "[t]hat's something that's well known in the industry that
petroleum products can cause, among other things, kidney damage?" he responded, "[e]xcessive
exposure to petroleum, absolutely."  Id.  Mr. Cupp confirmed that the photograph taken by
REMCO on March 24, 2014, shows weathered product consisting of either diesel fuel or
gasoline or some combination of the two.  Id.  When asked whether Pilot informed REMCO of
the health risks or to take precautions, Mr. Cupp responded that Pilot contacted Sovereign and
that it was Sovereign's responsibility to inform REMCO.  Id.

 Sovereign technician Daniel Slavin was at the site of the excavation on Tuesday, and
Carolyn Hardt, an engineer with Sovereign, was at the site on Wednesday.  Ms. Hardt testified
that on March 26, 2014, she believed[3] the employees of REMCO were her health and safety
concern.  Hardt Dep. Pls.' Statement Undisputed Facts Ex. 15, ECF No. 50-10.  She stated that if
she had been aware that the dirt they were moving was contaminated, she would have advised
them, but that she was not so informed.  Id.  Ms. Hardt stated that she knew chemicals in
gasoline were toxic.  Id.  Mr. Slavin, on the other hand, testified that in early 2014 he thought the
health hazards of skin's exposure to fuel was skin irritation.  Slavin Dep. Pls.' Statement
Undisputed Facts Ex. 13, ECF No. 50-6.  He also testified, however, that if a Sovereign
employee was going to be working around fuel products, the employee would wear personal
protective equipment.  Id.

---

[3] Ms. Hardt testified that if REMCO was hired by Pilot, she believed it would not have
been her responsibility to inform REMCO of any health and safety concerns.  Hardt Dep.
However, on March 26, 2014, she believed REMCO was hired by Sovereign and was therefore
responsible for the health and safety of its employees.  Id.

Plaintiff testified that at no point did anyone, either from REMCO, Pilot, or Sovereign, tell him to stop working at the excavation site.  Pl.'s Dep.  Further, Plaintiff stated that no one from Pilot or Sovereign informed him about the underground fuel leaks.  Id.  According to Plaintiff's testimony, he assumed Sovereign's employees were there for billing purposes, and he never spoke with anyone from Pilot or Sovereign about the liquid present in the excavation.  Id.

Plaintiff testified that he did not wash his clothes while working at Pilot's Facility. Rather, at the end of each day he placed his work pants, overalls, and jacket inside his truck, for he knew they would become soiled again the following day.  When the job concluded, Plaintiff placed his ruined clothes in a trash bag and placed the trash bag in his home garage.  A photograph of Plaintiff shows a dark liquid covering almost all of his pants and much of his jacket and hood.  Pl.'s Dep.

Plaintiff testified that in the days following his work at Pilot's Facility, he experienced severe nausea, dizziness, disorientation, jaundice, weight loss, loss of appetite, and loss of vision. He presented to the emergency room of St. Luke's Hospital in Allentown on May 1, 2014. Plaintiff now suffers from, inter alia, end stage renal disease and kidney failure.  Compl. ¶ 83. Plaintiff testified that he receives dialysis three times per week and will continue to need such treatment unless/until he receives a kidney transplant.  Pl.'s Dep.

Plaintiff produced expert liability reports, including a report from Dr. Cignatta that summarizes Pilot's alleged negligence and recklessness in this case. Among other things, Dr. Cignatta opines that Pilot failed to maintain its "fuel systems" in compliance with Pennsylvania law, allowed fuel to release into the soil beneath its storage tanks and diesel dispensers, failed to investigate or report these known releases, failed to advise Plaintiff of the known SPL contamination found in MW-3, failed to advise Plaintiff of the known SPL contamination found

in its utility vault, failed to advise Plaintiff of the health effects of known chemical hazards located precisely where Plaintiff performed his work for Pilot, failed to retain a qualified remediation contractor to remediate the area of excavation, and permitted plumbers, "with no specialty exposure training or equipment, to remain actively working in the excavation pit even after the presence of SPL was identified." Pilot has produced no expert liability report.

### B.    Procedural History

Plaintiffs Jason Marino and Joy Marino, husband and wife, and Thomas Marino and Lisa Marino, husband and wife, initiated this action on August 8, 2014, by filing a Complaint in this Court. Plaintiff asserts a negligence claim against Pilot in Count I, Compl. ¶¶ 70-80; violations of the Storage Tank and Spill Prevention Act ("STSPA"), 35 Pa. Stat. and Cons. Stat. Ann. §§ 6021.102-6021.2104, against Pilot at Count II, Compl. ¶¶ 81-89; and in Count III, a claim of negligence against Sovereign, Compl. ¶¶ 90-99. In Count IV, Joy Marino asserts a loss of consortium claim against Pilot and Sovereign. Compl. ¶¶ 100-101. In Count V, Thomas Marino raised a claim against all Defendants, Compl. ¶¶ 102-110, and his wife, Lisa Marino, averred a loss of consortium claim at Count VI. Compl. ¶¶ 111-112.

Pilot filed an Answer to the Complaint asserting, inter alia, a crossclaim against Sovereign. Answer, ECF No. 11. Pilot argues that if Plaintiffs' allegations are proven, Sovereign is solely liable. Id.

On September 3, 2014, Sovereign filed a Motion to Dismiss Counts V and VI. Def. Sovereign's Mot. Dismiss, ECF No. 3. The Motion was granted on July 6, 2015, and Thomas Marino and Lisa Marino were terminated as Plaintiffs. ECF Nos. 42-43.

On or about August 31, 2015, Plaintiffs filed a Motion for Partial Summary Judgment against Pilot Travel Centers, LLC. Pls.' Mot. Summ. J., ECF No. 53. Plaintiffs argue that there

are no issues of material fact concerning Pilot's violations of the STSPA, and that this Court should find as a matter of law that Pilot breached its duties of care to Plaintiff.  Plaintiffs assert that if the Motion is granted, the only issues for trial, with respect to Pilot's liability, will be causation and damages.

Pilot, noting that Plaintiff does not specifically seek summary judgment on the negligence or STSPA count, filed a response on September 5, 2015, contending that there is a genuine dispute of material fact as to whether it violated a duty of care to Plaintiff under the STSPA, that a violation of the STSPA does not constitute negligence per se under the instant facts, and that Plaintiffs' Motion seeks fragmented relief not permitted by Federal Rule of Civil Procedure 56(a).  Pilot's Resp. Opp'n  Pls.' Mot. Summ J., ECF No. 65.  Although Plaintiffs' Motion only seeks summary judgment against Pilot, Sovereign nevertheless filed a response on September 15, 2015, stating that it had no duty to Plaintiff under the STSPA.  Sovereign's Resp. Opp'n Pls.' Mot. Summ. J., ECF No. 67.

Plaintiffs reply that there is no dispute regarding Pilot's numerous DEP citations for reportable releases in violation of the STSPA, and that Pennsylvania courts have recognized a violation of a statute as the basis for negligence per se.  Pls.' Reply Mem. Supp. Mot. Summ. J., ECF No. 82-1.

Sovereign filed a Motion for Partial Summary Judgment on the Issue of Punitive Damages on August 31, 2015.  Sov.'s Mot. Summ. J., ECF No. 54.  Sovereign argues that Plaintiffs' claims are meritless, and that the facts underlying the request for punitive damages are not supported by record evidence.  Sovereign asserts that the testimony of its employees demonstrates that it lacked the subjective appreciation that Plaintiff could suffer physical harm by performing plumbing work in the excavation pit, and that Sovereign did not consciously

disregard a risk of harm to Plaintiff. Sovereign contends that none of the soil samples it collected contained detectable concentrations of targeted chemicals above statewide health standards, it was not aware Plaintiff would be working in liquid, and it was not known that toluene or gasoline can allegedly cause kidney damage.

Plaintiffs respond that Sovereign's subcontractor installed a monitoring well in close proximity to the leaks and was responsible for rupturing the water line Plaintiff was contracted to repair. Pls.' Resp. Opp'n Sov.'s Mot. Summ. J., ECF No. 63-2. Plaintiffs contend that Sovereign's own experts opine that Pilot allowed petroleum to be released into the soil and that Sovereign knew the DEP discovered fuel leaks in nineteen locations. Plaintiffs assert that Sovereign also knew that Plaintiff did not have personal protective equipment to guard against exposure and that exposure to petroleum chemicals was hazardous, but watched Plaintiff work in the contaminated excavation pit. Plaintiffs aver that the reason representatives of Sovereign were present during the repairs was to ensure that the plumbers were performing the work safely. Additionally, Plaintiffs note that Sovereign is an environmental consulting and remediation firm with greater knowledge of the risks of exposure to petroleum chemicals than Plaintiff.

In reply, Sovereign states that there is no evidence that it intentionally concealed information from Plaintiff to support a finding of reckless indifference. Sovereign's Reply Supp. Mot. Summ. J., ECF No. 73.

On August 31, 2015, Pilot similarly filed Motion for Partial Summary Judgment on the Issue of Punitive Damages. Pilot's Mot. Summ. J., ECF No. 55. Pilot asserts that there is no evidence of evil motive or reckless indifference, and that it took every precaution to ensure that Plaintiff was not exposed to any oil or other petroleum product during the pipe repair.

In response, Plaintiff submits that he was an invitee at Pilot's Facility and Pilot had a duty to protect against known and knowable dangers.  Pls.' Resp. Opp'n Pilot's Mot. Summ. J., ECF No. 64.  Plaintiffs further submit that Pilot had a duty to warn Plaintiff of the dangerous conditions regardless of who exercised full control over the premises.  Plaintiffs assert that Pilot knew of the fuel leaks in late 2013, but never took any steps to repair the leaks.  Plaintiffs contend that the DEP found leaks in nineteen separate locations and determined that Pilot violated the STSPA.  Also, Plaintiffs allege that shortly before Plaintiff began work at Pilot's Facility, Sovereign again informed Pilot of the contamination but failed to inform REMCO.  Plaintiff argues that while he was working at the site Pilot learned with certainty that there was fuel in the excavation pit.

Pilot replies that it took appropriate steps and told Plaintiff's supervisor that Plaintiff should not perform any additional work in the excavation pit until the liquids could be pumped out.  Pilot's Reply Supp. Mot. Summ. J., ECF No. 72.  Pilot asserts that it also told Plaintiff directly not to resume work.

## III.   STANDARD OF REVIEW

"Through summary adjudication the court may dispose of those claims that do not present a 'genuine issue of material fact.'"  Ill. Union Ins. v. Hydro Int'l, PLC, 929 F. Supp. 2d 365, 371 (M.D. Pa. 2013) (quoting Fed. R. Civ. P. 56(c)).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. <u>Anderson</u>, 477 U.S. at 248; <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.</u>, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56; <u>Celotex</u>, 477 U.S. at 324; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323; <u>see also</u> <u>Harter v. GAF Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  <u>Big Apple BMW, Inc. v. BMW of N. Am. Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

IV.     <u>ANALYSIS</u>

    A.    **Plaintiffs' Motion for Partial Summary Judgment**

Initially, this Court finds that Plaintiffs' Motion seeking partial summary judgment is permitted by Federal Rule of Civil Procedure 56(a).  In 2010, the "first sentence of Rule 56(a) was added to make clear that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense."  2-17 James Wm. Moore et al., <u>Moore's Federal Practice and Procedure</u> § 17.64.  <u>See also</u> <u>In re Merck & Co. Sec., Derivative & "ERISA" Litig.</u>, MDL No. 1658 (SRC), 2015 U.S. Dist. LEXIS 79711, at *51 (D.N.J. June 19, 2015) (concluding that the defendant's request for summary judgment on only a portion of a claim was authorized under Rule 56 and noting that the cases cited in the plaintiff's opposition pre-dated the 2010 amendment to Rule 56).

Nevertheless, this Court finds that summary judgment should not be granted in this case. Based solely on alleged violations of the STSPA, Plaintiffs seek partial summary judgment on both Count I, negligence, and Count II, violation of the STSPA.  Pls.' Reply Supp. Mot. Summ. J.  However, in the negligence claim, the Complaint asserts that the duty of care Pilot owed to Plaintiff was that of an invitee.  Compl. ¶ 71.  Accordingly, Plaintiffs' Motion is denied as to the negligence count.

The STSPA provides that the "owner or operator of a storage tank and the landowner or occupier on whose land a storage tank is or was located shall not allow pollution resulting from, or a release to occur from, a storage tank."  35 Pa. Stat. and Cons. Stat. Ann. § 6021.1310.  The STSPA "was enacted by the Pennsylvania legislature to protect 'the public health and safety' by controlling 'the storage of regulated substances in new and existing storage tanks.'"  <u>Darbouze v. Chevron Corp.</u>, No. 97-2970, 1998 U.S. Dist. LEXIS 12744, at *35 (E.D. Pa. Aug. 18, 1998)

(quoting <u>Centolanza v. Lehigh Valley Dairies, Inc.</u>, 658 A.2d 336, 338 (Pa. 1995)).  "When the [DEP] fails to enforce the provisions of the [STSPA], private litigants may bring an action under section 1305 'to collect costs for cleanup and diminution in property value.'"  <u>Id.</u> at *36.  The STSPA "pertains to the condition of being polluted, not only to the originating leak itself." <u>United States v. Sunoco, Inc.</u>, 501 F. Supp. 2d 656, 667 (E.D. Pa. 2007) (finding that although the petroleum may have leaked into the soil prior to enactment of the STSPA, the "polluted condition at the time of enactment puts the owner 'in violation' of the [] Act").

> The STSPA creates
>
> a rebuttable presumption of law in civil and administrative proceedings that a person who owns or operates an aboveground or underground storage tank shall be liable, without proof of fault, negligence or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution. Such presumption may be overcome by clear and convincing evidence that the person so charged did not contribute to the damage, contamination or pollution.

35 Pa. Stat. and Cons. Stat. Ann. § 6021.1311.  <u>See also</u> <u>Blue Mountain Envtl. Mgmt. Corp. v. Chico Enters.</u>, 190 F. App'x 150, 154 (3d Cir. 2006) (refusing to grant summary judgment on the negligence counts because there was a genuine issue of material fact with respect to whether the defendant caused the contamination and whether the release of gasoline contaminants was caused by negligence on the defendant's part).  "Private litigants are also afforded the statutory rebuttable presumption." <u>Darbouze</u>, 1998 U.S. Dist. LEXIS 12744, at *36; <u>Centolanza v. Lehigh Valley Dairies</u>, 635 A.2d 143, 149 (Pa. Super. Ct. 1993).  The STSPA's presumption of liability "alleviates the need for a plaintiff to prove causation." <u>United States v. Sunoco, Inc.</u>, 644 F. Supp. 2d 566, 577 (E.D. Pa. 2009).  "The presumption may be overcome with clear and convincing evidence that the defendant did not contribute to the damage, contamination or

pollution." F.P. Woll & Co. v. Fifth & Mitchell St. Corp., No. 96-5973, 1999 U.S. Dist. LEXIS 894, at *24 (E.D. Pa. Feb. 3, 1999).

Plaintiffs argue that there are no issues of material fact concerning Pilot's violations of the STSPA and that this Court should find as a matter of law that Pilot breached its duties of care to Plaintiff.  Pilot responds that there is a genuine dispute of material fact as to whether the alleged pollution resulted from a release from a storage tank or, rather, from a leak in the oil interceptor, which the water line ran through, or in the vault, which contained a junction for the water line.  Pilot contends that if either of the latter is true, there was no violation of the STSPA because the release was not from a storage tank.  Additionally, Pilot asserts that Plaintiffs are not entitled to application of the doctrine of negligence per se because the STSPA protects the public generally and not a particular group that Plaintiff falls into.

Considering the deposition testimony of Brian Becker, Sovereign's environmental scientist and project manager, that the SPL in MW-3 was attributable to the pathway of the utility vault, REMCO's email stating that the source of the oil that went into the excavation "is the oil water separator that is leaking into the ground," and the absence of any conclusive evidence regarding the source of the leak, this Court finds that there is a genuine issue of material fact on Plaintiff's STSPA claim.  Plaintiffs' Motion is denied.  It is therefore unnecessary to reach a decision as to whether a violation of the STSPA can supply the basis for a finding of negligence per se.

**B.      Defendants' Motions for Partial Summary Judgment on Punitive Damages**

"The standard for awarding punitive damages under Pennsylvania law is well-established." Gucciardi v. Bonide Prods., 28 F. Supp. 3d 383, 394 (E.D. Pa. 2014). "Pennsylvania law provides that a defendant must have engaged in 'outrageous' or 'intentional,

reckless or malicious' conduct to sustain a claim for punitive damages." Boring v. Google Inc., 362 F. App'x 273, 282 (3d Cir. 2010) (quoting Feld v. Merriam, 485 A.2d 742, 747-48 (Pa. 1984)).  "This standard is disjunctive: 'The defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard.'" Springer v. Henry, 435 F.3d 268, 281 (3d Cir. 2006) (quoting Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989)).

   "A defendant acts recklessly when 'his conduct creates an unreasonable risk of . . . harm to another [and] such risk is substantially greater than that which is necessary to make his conduct negligent.'" Gucciardi, 28 F. Supp. 3d at 394 (quoting Hutchison, 870 A.2d at 771). "While ordinary negligence will not support an award of punitive damages, 'punitive damages are appropriate for torts sounding in negligence when the conduct goes beyond mere negligence and into the realm of behavior which is willful, malicious, or so careless as to indicate wanton disregard for the rights of the parties injured.'" Id.  "There is no cause of action for recklessness under Pennsylvania law. Rather, recklessness is a heightened standard of care required to potentially recover punitive damages." M.U. v. Downingtown High Sch. E., No. 14-04877, 2015 U.S. Dist. LEXIS 54765, at *35-36 (E.D. Pa. Apr. 27, 2015) (citations omitted).

   **1.     Defendant Sovereign's Motion for Partial Summary Judgment**

   Sovereign's environmental scientist and project manager knew before REMCO was hired that there was SPL in MW-3 and that it was possible to have the SPL removed from MW-3 before the plumbers began fixing the broken water line.  By Monday, March 24, 2014, when Sovereign was informed about the presence of fuel in the excavation pit, Mr. Becker also knew that the broken water pipe was in the same general vicinity as MW-3.  However, no one advised

Plaintiff of the contamination in MW-3 or to stop working.  Moreover, technicians from Sovereign were at the excavation site on Tuesday and Wednesday and observed Plaintiff working in the contaminated soil.  Again, Sovereign did not inform Plaintiff of the contamination, did not advise him of any health risks, and did not instruct him to wear personal protective equipment.  Sovereign also failed to inform its own engineer, who was sent to the Facility to ensure the safety of the project and knew chemicals in gasoline were toxic, that there was any contamination.

This Court finds that there is sufficient evidence from which a jury could find Sovereign's behavior reckless, and further that there are genuine issues of material fact, such as whose responsibility it was to inform Plaintiff and/or REMCO of the risks.

### 2.      Defendant Pilot's Motion for Partial Summary Judgment

Pilot knew before REMCO was hired that there was SPL in MW-3 and also that there had been prior DEP violations.  A Pilot manager was on site the first day REMCO's plumbers began working and saw Plaintiff's soiled clothes, but never warned Plaintiff of the petroleum leaks. Pilot also knew by Plaintiff's second day of work that there was either gasoline or diesel fuel in the excavation pit.  Both Pilot's environmental project manager and senior environmental manager knew of the health risks that arise from exposure to diesel fuel and petroleum products. Pilot's senior environmental manager was also aware of the potential risk of kidney damage from exposure.  Nevertheless, Pilot did not advise Plaintiff of any health risks or caution him to wear personal protective equipment.

To the extent Pilot claims that it took appropriate steps to warn the REMCO plumbers and told Mr. Nace that Plaintiff should not perform any work in the excavation pit until the liquids could be pumped out, there is a genuine issue of material fact as to whether such direction

was made.  Additionally, it is undisputed that Plaintiff continued work the following day at Pilot's Facility without personal protective equipment under the supervision of a Sovereign employee.  Accordingly, this Court finds sufficient evidence to send the question of punitive damages to a jury.

## V.    <u>CONCLUSION</u>

For the reasons set forth in this Memorandum, each of Plaintiffs' Motion for Partial Summary Judgment, Defendant Sovereign's Motion for Partial Summary Judgment, and Defendant Pilot's Motion for Partial Summary Judgment is denied.

A separate order will be issued.


                                              BY THE COURT:


                                              */s/ Joseph F. Leeson, Jr.*_____
                                              JOSEPH F. LEESON, JR.
                                              United States District Judge